THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JASON ANDERSON,<br>　　　Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§<br>§ | Civil Action No. |
| PETER T. GAYNOR, Acting Administrator<br>Federal Emergency Management Agency,<br>　　　Defendant. | §<br>§<br>§<br>§ | JURY DEMANDED |

**COMPLAINT**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiff JASON ANDERSON, in the above numbered and entitled case, complains of PETER T. GAYNOR, ACTING ADMIISTRATOR FOR THE FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA). (Hereafter, "Defendant", "FEMA" and/or "Agency"), Defendant in the above numbered and entitled case and for cause(s) of action would respectfully show unto the Court and jury as follows:

**I. PARTIES**

1.　　Plaintiff, JASON ANDERSON is a citizen of the United States, who was employed as a Travel Specialist, by the FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA) at the Agency's branch office in Houston, Texas, during the time period wherein the present cause of action occurred. JASON ANDERSON is a federal employee within the meaning of Title VII of the Civil Rights Act of 1964, Section 701 et. seq., as amended, 42 U.S.C.A. 2000e, *et. Seq.,* 29 C.F.R. 1614 *et. seq.*, and 28 U.S.C. Section 1346. and at all relevant times was a federal employee. JASON ANDERSON (Hereafter "JASON") was a resident of Harris County, Texas during the relevant time period.

1

2. Defendant PETER T. GAYNOR is the ACTING ADMIISTRATOR FOR THE FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA), which is an agency of the United States government. Defendant does business at the Office of Associate Director for Mitigation, 500 C. Street, SW, Washington, DC 20472. Defendant PETER T. GAYNOR is sued in his official capacity as ACTING ADMIISTRATOR FOR THE FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA), and as such, is amenable to suit as provided in Title VII of the Civil Rights Act of 1964, Section 701 et. seq., as amended, 42 U.S.C.A. 2000e, *et. Seq*.

## II. JURISDICTION

3. This action arises under in Title VII of the Civil Rights Act of 1964, Section 701 et. seq., as amended, 42 U.S.C.A. 2000e, *et. Seq* and 28 U.S.C. Section 1346.

4. All of the necessary administrative prerequisites, have been met prior to filing the instant action, as Plaintiff has filed timely complaints of discrimination and retaliation with his federal employer, FEMA, and brings his claims more than 180 days after he filed his formal EEO Complaint.

5. The Southern District of Texas is where the action complained of in the present matter took place, where the employment records relevant to the unlawful practices are kept, and where the Plaintiff worked during the time-period, wherein the unlawful actions of the Defendant occurred.

6. The jurisdiction of the Court, is invoked pursuant to 28 US.C. §1343(a)(4).

### III. VENUE

7.     Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because the Defendant resides in this judicial district and a substantial part of the events giving rise to this action took place within this judicial district.

### IV. FACTS

8.     Jason began his employment at the FEMA Houston Branch Office on or about October 2017. Jason was part of a group of "local hires" who were hired after the flooding from Hurricane Harvey. Out of the 35 local hires, approximately 30 were Black, 4 White and 1 Hispanic. The disparity in the racial demographics of these 35 employees was not a coincidence but in fact intentional. The HR manager, Diane Randle (Black), intentionally recruited new hires in areas, places or forums where most, if not all, persons are Black. Thereby preventing persons of other races to apply for positions that Ms. Randle had a role in recruitment.

9.     Jason's first position with FEMA was as a Travel Specialist whose role was to assist all FEMA employees with authorization requests, vouchers/reimbursements, and travel planning. Jason's first supervisor was a Floyd Moreland (Black). Mr. Moreland regularly behaved unprofessionally as he would frequently spend hours away from the office and return looking intoxicated.

10.    When Mr. Moreland was actually working, his idea of training was spending long periods of time chatting about unrelated matters with another Black employee during what he designated as training time. Another permanent employee (White) that was on loan to FEMA from CIS, who said that Mr. Moreland was the worst manager she had ever worked with. She said that when she would ask a job-

related question, his typical response was that she was "thinking too much," and then not address it. Indeed, for the few times that Jason asked Mr. Moreland a question in front of his coworkers, Mr. Moreland's typical response intimated that Jason was an idiot for even asking. Jason learned that he should do everything that he could but not to ask Mr. Moreland for anything. Doing this was very frustrating to Jason because he wanted to do things correctly, yet it was repeatedly made clear that he could not defer to his own boss for guidance without being belittled.

11. Mr. Moreland's lack of leadership created a hostile work environment in other ways as well. The typical mode of discussion consisted of specific Black employees who would look for any opportunity to cut people off when they were speaking, and then interject as if only they knew the right answers. It became so obnoxious that even other Black employees eventually took issue with this conduct. The department Jason worked in consisted of 13 Black employees (11 of whom were women), and 2 White. This demographic was by design as Ms. Randle made it a point to mainly recruit Black employees and not use the typical advertising sources available to her like USAjobs.gov or the FEMA jobs website.

12. Jason wasn't alone in the discriminatory treatment. His other White colleague in Travel later applied for a job in another department, but was told that because he had no work experience in that area, he could not be hired. And yet, a much younger, Black male from Travel was hired for that same department only two weeks earlier, and apparently had no relevant work experience. Yet this was also the same Black employee who had almost been fired for chronic lateness. It was very clear to Jason that his Black coworkers were receiving preferential treatment compared to the white employees.

13. Jason's good work in Travel drew attention and praise from a 28-year veteran of FEMA, Ms. Charisse Fuqua (White). Ms. Fuqua was the lead manager for the Training Department, and Jason had impressed her with his work performance. About a month after Jason worked in Travel, Ms. Fuqua encouraged him to apply for a vacant Travel Specialist position. Ms. Fuqua had just received approval to hire two more employees in her department. Jason looked at a copy of the job description and was surprised to see how sparse it was. Jason had previously told Ms. Fuqua about his experience with training and supervising employees through his private sector work experience. Ms. Fuqua also made a point of telling Jason that he wouldn't have to actually teach classes. She asked him to get with Ms. Randle in HR and to ask her what HR needed as far as paperwork-wise for him to apply.

14. Jason then asked Ms. Randle (HR) what was needed from him to apply for the vacant Travel Specialist position. Ms. Randle's immediate response to him was to question his background in training. Jason replied that he had "tons," as he had led continuing education training and insurance seminars, and was also responsible for training both a division as a whole, and individual representatives and their assistants, in compliance and operational/processing procedures. Jason's standard resume was for financial services. Travel and Training are part of the Finance and Administration Cadre of FEMA– so Jason was undoubtedly working in the right section for his background. Jason's resume also included several references to his work training capacities, including his co-authorship of a training manual. Jason then emailed Ms. Randle a cover letter along with his resume which provided more details regarding Jason's training-related work.

5

15. A week later, Ms. Randle told Ms. Fuqua that Jason did not follow instructions, and that his resume would be "removed from consideration" and "discarded," due to a lack of training background. Of course this was factually untrue. Ms. Fuqua was very surprised by Ms. Randle's response. However, eventually Ms. Randle would advise Ms. Fuqua that Jason could be hired if she was willing to write a "request for an exception" for his candidacy. Ms. Fuqua did so, and Jason was now permitted to interview for the job.

16. Because Jason was both the best internal candidate to apply, and was also Ms. Fuqua's choice for the position, he was hired on as Training Specialist, and moved to the Training Department. About a week after Jason started, a new Training Support Specialist was hired named Ms. Ayanna Fleming (Black). Ms. Fleming had no experience with training adults, or with leading CE for employees but she made no reservations about telling Jason that she was upset because she felt that she should have been hired for Jason's position.

17. Ms. Fuqua "demobilized" to return back home and she was replaced by Mr. Jeff Januchowski (White). Mr. Januchowski took a mostly hands-off approach to management. However, Mr. Januchowski did tell Jason, one day, that he wanted Jason to instruct some classes, because "that's what a training specialist does." This was a major change in tasks from what Jason was told by Ms. Fuqua.

18. The first course that Mr. Januchowski asked Jason to instruct was a 40-hour one for managers, which was the highest level of class that existed at the agency. Mr. Januchowski also demobilized himself in early February 2018, but not before writing an excellent performance appraisal on Jason. Twaski Simmons (Black) would then take over as Jason's supervisor.

19. Jason did get to attend the management class for the course that he was going to instruct, but it was only the week before he was expected to instruct it. He had read the 437-page manual, and was ready to go. That weekend in-between Jason taking the class and being scheduled to teach it, he wrote down detailed notes about everything that he was going to cover. He knew the material well, but that Sunday evening, he had a car accident. Jason panicked and emailed Mr. Simmons and Ms. Tracy King (Instructor), and told them about the accident. Jason made it clear that he was ready, but that he was worried that the presentation would not be received well.

20. On or about Monday morning February 12, 2018, the replacement manager Ms. Teri Gruss (White) called Jason, at which time Jason explained his situation. Jason told her that he would rather quit or be fired than do a lackluster job and he only wanted the best for them as a department. It should be noted that this wasn't the first time that there was a no-show due to emotional distress, as Ms. Fleming had done the same the prior week. Ms. Fleming was given a day off but Jason was not afforded the same treatment. Mr. Simmons texted Jason Monday afternoon and asked that he give him a call. Jason called him and much to his surprise, Mr. Simmons asked if they could give things a "second chance," and for Jason to come in "bright and early" the next day. Jason thanked Mr. Simmons and told him how blessed he was for this response.

21. On or about Tuesday morning February 13, 2018, Ms. Gruss convinced Jason to teach 2 of the 5 units that he was scheduled to teach, so of course he agreed. They also each met one on one with Mr. Simmons, at which time Jason showed him the work that he did to prepare for the class. However, that afternoon, after returning to Austin, Mr. Simmons did another strange thing. He emailed Ms. Fleming and Jason, asking

7

them for copies of their resumes and a list of the tasks that they perform as part of their jobs.

22. On or about the next morning February 14, 2018, Jason was preparing for the first of his two units. Mr. Simmons emailed them again while Jason was getting ready, and reminded them of his "urgent" request. So, Jason complied and sent Mr. Simmons his resume and list of tasks. Jason proceeded to teach his first unit that afternoon. Ms. King commented that Jason did a great job. She said that it was clear that Jason knew the material, and that he was comfortable with every question that he had gotten from the attendees.

23. On or about the following day February 15, 2018, Jason was teaching a unit. Ms. King once again complemented Jason with specific examples. Ms. King observed that he took the time to explain the PowerPoints, which were sometimes confusing.

24. On or about Friday February 16, 2018, Jason was getting ready for the first instructor to finish so that he could finish his unit and be done for the week. Mr. Simmons suddenly showed up, and gestured for Jason to step into another office. Mr. Simmons had Ms. Randle with him, and he told Jason that he was there to "release him, effective immediately." Jason asked him why he was releasing him, and Mr. Simmons replied "performance." Jason asked him what specifically about his performance did Mr. Simmons have issue with, but Mr. Simmons wouldn't say, responding, "This is my decision, and it is not up for discussion."

25. Jason then asked Mr. Simmons why he would do this after encouraging him to stay on-board. At that point, Mr. Simmons asked Ms. Randle to step out of the room. He then told Jason that there were some things about Jason that he had recently learned about,

that he was not aware of, and for which he was now mad about. Mr. Simmons claimed that Jason was not being honest with him. Jason asked Mr. Simmons what he was specifically concerned about but he wouldn't say. Mr. Simmons did say that there was no reference to training in Jason's resume. Jason said that was not true, and that it was there. However, Mr. Simmons was not interested in listening to what Jason had to say and Jason's employment with FEMA was unlawfully terminated because of Jason's race/color (Caucasian, White). Shortly after Jason's termination Ms. Fleming was promoted and assumed Jason's vacant position. Jason who's skill set was superior to that of Ms. Fleming was terminated because of his race and then replaced by a much less experienced Black coworker.

26. Jason was clearly qualified for the Travel Specialist position. At all relevant times, Jason continued to be qualified to fulfill the requirements of the Travel Specialist position.

27. On information and belief, Jason asserts that the Defendant acted with malice and in reckless disregard of Jason's rights and welfare.

### V. CAUSES OF ACTION

28. Jason incorporates the preceding and proceeding paragraphs into this paragraph by reference. The above described facts constitute discrimination based on race/color in violation of the Title VII of the Civil Rights Act of 1964, Section 701 et. seq., as amended, 42 U.S.C.A. 2000e, *et. Seq.,* 29 C.F.R. 1614 *et. seq*. Defendant took adverse actions against Jason because of his race/color when he was unlawfully terminated.

29. Jason incorporates the preceding and proceeding paragraphs into this paragraph by reference. The Defendant's actions also amounted to a hostile work

environment based on race/color in violation of Title VII of the Civil Rights Act of 1964, Section 701 et. seq., as amended, 42 U.S.C.A. 2000e, *et. seq.,* 29 C.F.R. 1614 *et. seq.*

## VI.　DAMAGES

30.　Jason's claims of discrimination are within the jurisdictional limits of this Court.

31.　Jason incorporates the preceding and proceeding paragraphs into this paragraph by reference. The conduct described above proximately caused actual and compensatory damage to Jason, including but not limited to lost wages, benefits, humiliation and emotional distress, physical pain and suffering, medical services, damage to his personal reputation, damage to his professional reputation, damage to his earning capacity, and damage to his enjoyment of life.

32.　Jason is entitled to recover reasonable attorney fees pursuant to EAJA 28 U.S.C. § 2412(b), Title VII of the Civil Rights Act of 1964, Section 701 et. seq., as amended, 42 U.S.C.A. 2000e, *et. Seq.,* and 29 C.F.R. 1614 *et. seq.*

## PRAYER FOR RELIEF

34.　WHEREFORE, Jason requests that this Honorable Court advance this case on the docket, order a jury trial at the earliest practical date, and grant Jason the following relief pursuant to all federal law and statutes cited in the preceding and proceeding paragraphs, including, but not limited to the following:

   (a)　Grant Jason a permanent injunction enjoining Defendant, its agents, successors, employees, and those acting in consort with Defendant, from continuing to violate Jason's rights;

(b) Issue an order awarding Jason back pay with interest, fringe benefits, and any other appropriate relief necessary to make Jason whole and compensate him for the civil rights violations described above;

(c) Award Jason compensatory damages for mental anguish;

(d) Award Jason prejudgment and post-judgment interest as allowed by law;

(e) Award Jason attorney fees and costs of this suit;

(f) Award Jason such other legal and equitable relief as this Court deems just and proper;

(g) Award Jason damages requested in part VI of this Complaint;

(h) Award Jason all other relief, in law and equity, to which he may be entitled.

Respectfully submitted,

/s/ Ashok Bail_____
Ashok Bail
Attorney for Plaintiff
3120 Southwest Freeway, Suite 450
Houston, TX 77098
Tel. No. (832)-216-6693
Fax. No. (832)-263-0616
E-mail: ashok@baillawfirm.com